IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 5:22-mj-00035 |
| | ) | |
| GERALD KENDRICK OXNER, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANT

I, Bernard Mensah, being duly sworn, depose and state as follows:

## I.    INTRODUCTION

### A.    Purpose of Affidavit

1.      I make this affidavit to establish probable cause in support of a criminal complaint charging Gerald Kendrick **OXNER** with a violation of 18 U.S.C. § 924(a)(1)(A) (False Statement During Purchase of a Firearm) occurring on or about on January 21, 2021 in the Western District of Virginia.

### B.    Agent Background and Experience

2.      I have been a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") since May of 2017 and am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered by law to conduct investigations and to make arrests for the offenses enumerated in 18 U.S.C. § 2516.  I am currently assigned to the ATF Washington Field Division's Group V, NIBIN Investigation Group (NIU). Prior to being assigned to NIU, I was assigned to the Firearm Trafficking Group where my assignments included investigating individuals who were involved in the illegal possession and

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

transfer of firearms, violent crimes involving firearms, and narcotics and firearms trafficking. Since joining the ATF, I have successfully completed numerous training programs hosted by ATF, and other local, state, and federal law enforcement agencies and organizations including the Federal Law Enforcement Training Center's 12-week Criminal Investigator Training Program and the 14-week ATF Special Agent Basic Training Program.  I have conducted and participated in electronic surveillance operations, executed search warrants and arrest warrants, developed sources of information, and conducted international operations that collaborated with foreign law enforcement entities.

> **C.**       **Sources of Information**

3.       The facts in this affidavit come from a variety of sources, including: my personal knowledge of the facts and circumstances obtained through my participation in this investigation, my training and experience, information obtained from other law enforcement officers/agents and witnesses, information gathered through law enforcement surveillance efforts, and information provided by records and databases, as well as other sources.  All observations not personally made by me were relayed to me by individuals who made them or are based on my review of reports, documents, and other evidence obtained during the investigation.  Where I refer to statements and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted.  This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.  Similarly, where information contained in reports and other documents or records are referenced herein, such information is also described in sum and substance and in relevant part only.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## II.    APPLICABLE LAW

3.      Under 18 U.S.C. § 924(a)(1)(A), it is unlawful to make a false statement during the purchase of a firearm.  The elements of the offense are as follows: (1) the defendant knowingly made a false statement or representation; (2) the defendant made the statement or representation to a licensed dealer, importer, manufacturer or collector of firearms, as defined by statute; and (3) the statement pertained to information that the law requires the licensed dealer, importer, manufacturer or collector to keep.

## III.    PROBABLE CAUSE

### A.    Overview of Investigation and Background on Federal Firearms Licensee Records and Requirements

4.      As detailed below, law enforcement is investigating a firearm used in a shooting on or about January 25, 2021, in Washington, D.C., resulting in the death of one person and gunshot injuries to three others.  Investigators discovered the firearm was purchased within the Western District of Virginia by **Gerald OXNER** (hereafter, "OXNER") on or about January 21, 2021.  The alleged shooter, T.O., is currently in-custody and charged with first-degree murder.  The alleged shooter is a close relative of **OXNER**.  For reasons detailed below, I believe **OXNER** made one or more false statements when purchasing the firearm for T.O., the actual buyer and an out-of-state resident, and **OXNER** has likely purchased and trafficked firearms with multiple other individuals.

5.      Through my training and experience, I know there are various laws related to the purchase, sale, and transfer of firearms.  In particular, I know that federal law prohibits federal firearms licensees ("FFLs") from selling a firearm to a non-licensee purchaser "unless the [FFL] records the transaction on a firearms transaction record, Form 4473."  27 C.F.R. § 478.124(a).  I am further aware that the law requires FFLs to retain "as a part of the required records, each Form 4473 obtained in the course of transferring custody of the firearms."  27 C.F.R. § 478.124(a).  Accordingly, any false statement a purchaser makes on a Form 4473 pertains to information an FFL is required by law to maintain.  As part of this investigation, ATF generally, and I specifically,

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

have reviewed multiple ATF Form 4473s, Firearm Trace Summaries, video surveillance footage and interviewed Federal Firearm Licensees (FFLs).

**B.**      **Identification of OXNER as Suspicious, Repeated Firearms Purchaser Connected to Criminal Conduct**

6.      As described herein, law enforcement began investigating **OXNER** after identifying him as the purchaser of a Smith and Wesson, M&P 9 Shield EZ, 9mm pistol bearing serial number NJE1228 (hereinafter, "GUN A").  Below is an image of GUN A.



7.      Law enforcement recovered GUN A, which bore an obliterated serial number, during an arrest in Anne Arundel County, Maryland on or about June 5, 2021.  After the serial number was forensically restored by laboratory technicians, and a NIBIN[1] analysis was conducted, it was determined that GUN A was used in a shooting resulting in a homicide and other injured parties in Washington, D.C. on or about January 25, 2021.  Review of NIBIN reports, in

---

[1]      The National Integrated Ballistic Information Network (NIBEN) is a database of digital images of spent bullets and cartridge cases found at crime scenes or test-fired from seized/confiscated weapons.  These images can be used to link crimes and develop investigative leads by connecting a particular firearm to one or more shootings.  This analysis is conducted through matching distinctive, unique markings, called tool marks, transferred from a firearm to a bullet or cartridge when fired.

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

conjunction with Metropolitan Police Department's arrest packet, showed that Gun A was allegedly used by T.O. in the homicide on January 25, 2021. T.O. was arrested and charged in the United States District of Columbia and is currently in Washington, D.C. jail awaiting trial.

8.      To further the investigation, I reviewed an ATF Firearm Trace Summary for GUN A. The report listed **OXNER** as having purchased GUN A on January 21, 2021. Per records, **OXNER** made the purchase from Rural King Holdings LLP located in the Front Royal, Virginia. Front Royal is located within Warren County in the Western District of Virginia.

9.      That analysis narrowed the time to first identified use of the firearm to four (4) days. It was significant to my investigation that the firearm purchased by **OXNER** was likely used very soon thereafter by his relative, T.O, in a shooting, as alleged in the pending federal matter.

10.     From training, experience, and common sense, I know that criminals will often use their family members, significant others, close friends, or others to purchase firearms on their behalf and conspire with these individuals to evade gun law reporting requirements and/or restrictions. These purchasers are often referred to as "straw purchasers" because they are not the true buyers of the firearm. And, I know that individuals involved in straw purchasing may do so repeatedly and, in many instances, may profit in money or trade from the individual illegal sales and/or trafficking of multiple firearms.

11.     I began to investigate whether **OXNER** had made other firearms purchases. A query of Virginia State Police (VSP) records indicated that within ten months, approximately eight (8) background checks were conducted at multiple Federal Firearm Licensees (FFLs) in the Western District of Virginia. This indicated that **OXNER** purchased multiple firearms within the last few months, with majority of firearms being 9mm Glock pistols.

12.     I also identified an additional firearms trace involving Hawk Industries Inc. H&R Pardner Pump, 12-gauge shotgun with serial number NZ840020 (hereinafter, "GUN B"). OXNER purchased GUN B on or about December 8, 2017, from United Gun Shop, located in Rockville,

Maryland.  GUN B was also recovered by law enforcement in Prince George's County with a 208 Time to Crime.[2]

13.    Recently, I was notified of another ATF trace involving **OXNER**'s Glock 19, 9mm pistol bearing serial number AN663 (hereinafter, "GUN D"). This firearm was recovered by Metropolitan Police Department on February 12, 2022, during the execution of a search warrant in reference to a shooting.  Along with "GUN D" being recovered in possession of a felon, it had a 31-round extended magazine inserted, two additional firearms, one with an obliterated serial number, and distribution level amounts of marijuana and other controlled substances.   Below are two photographs of GUN D:




14.    To date, **OXNER** has been connected to one firearm recovered in Washington, D.C., and two firearms recovered by law enforcement in Maryland, with one used in a homicide.

---

[2]    ATF utilizes the term "Time to Crime" as a measure of time between when a firearm is purchased from an FFL to the time the firearm is recovered by law enforcement.  Due to technological advances, ATF utilizes NIBIN to narrow the time between a firearm being purchased from an FFL to the time it is used in an identified shooting.  That scenario is considered, "Time to First Use."

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

6

The location where these firearms were found is consistent with **OXNER** transferring firearms to individuals residing out of state from where the firearms were originally purchased. These facts, coupled with the volume of purchases conducted by **OXNER** in a relatively condensed timeframe, are consistent with **OXNER** acting as a straw purchaser and likely engaging in firearms trafficking.

        C.       **Records of OXNER's Firearms Purchases from Middletown Firearms, including ATF Form 4473**

2.       On or about November 12, 2021, Metropolitan Police Department (MPD) Detective Thomas Webb and I traveled to Middletown Firearms located at 7609 Main Street, Middletown, Virginia. We visited the FFL to gather information about **OXNER**'s firearm purchases.

3.       We collected copies of ATF Form 4473s filled out by **OXNER** for multiple firearms. In addition, the FFL provided a copy of Virginia State Police (VSP) Transaction report and receipt of purchase for the firearms purchased in the current year.

4.       On or about October 4, 2021, **OXNER** purchased a Glock 19 Gen4, 9mm caliber pistol bearing serial number ZXY307 (hereinafter, "GUN C"). Sales receipt showed that **OXNER** paid $597.19 in cash for the firearm, a box of 9mm caliber ammunition and a 33 round Glock magazine.

5.       On or about August 31, 2021, **OXNER** purchased a Glock 19, 9mm caliber pistol bearing serial number AN663 ("GUN D"). Sales receipt showed that **OXNER** paid $449.72 in cash for the firearm and a box of 9mm caliber ammunition.

6.       On or about May 8, 2021, **OXNER** purchased a Glock 19 Gen5, 9mm caliber pistol bearing serial number BSDB070 (hereinafter, "GUN E"). Sales receipt showed that **OXNER** paid $623.55 in cash for the pistol transaction.

7.       On or about April 7, 2021, **OXNER** purchased a Glock 43X, 9mm caliber pistol bearing serial number BTFT245 (hereinafter, "GUN F"). Sales receipt showed that **OXNER** paid $528.74 in cash for the pistol transaction.

8.     On or about March 1, 2021, **OXNER** purchased a Glock 26 Gen5, 9mm caliber pistol bearing serial number ADNF200 (hereinafter, "GUN G"). Sales receipt showed that **OXNER** paid $581.41 in cash for the pistol transaction.

9.     Upon review of each ATF Form 4473 from Middletown's firearm transfers, it was noted that **OXNER** checked "Yes" in Block 21a, which states, "Are you the actual transferee/buyer of the firearm(s) listed on this form?"  In doing so, **OXNER** affirmed that he was the actual transferee/buyer of the firearm listed on line 1- 3 on the forms.  Line 22 of the ATF Form 4473 was signed by **OXNER**, certifying that his answers were true, correct, and complete.

10.    Further review showed that **OXNER** used an address on Beale Court in Woodbridge, Virginia (herein, the "Woodbridge Address") as his current address to complete ATF Form 4473 and purchase each firearm.  We later discovered that OXNER, through his own admission, did not reside at the listed address during the time frame of the above-described purchases.

**D.     Records of OXNER's Firearms Purchases from Rural King FFL, including Receipt of ATF Form 4473, and Interview of Store Manager**

11.    In connection with the investigation, investigators visited Rural King FFL located at 465 South Street, Front Royal, Virginia to gather information about GUN A.   At this location, I received copies of ATF Form 4473s filled out by **OXNER** for two firearms.  One of the forms was for GUN A.  In addition, the FFL provided agents with a disposition receipt of purchase and an invoice statement for GUN A.

12.    On or about January 21, 2021, **OXNER** purchased GUN A with $20 in cash and charged the remaining balance to a bank card for $455.84.

13.    On or about March 21, 2020, **OXNER** purchased an HS Product, Springfield XD-9 4.0 Mod 2, 9mm pistol bearing serial number GM878968 (hereinafter, "GUN H").  The purchase was conducted online therefore, employees were unable to retrieve the receipt.

Mensah Aff. in Support Of A Criminal Compl.

14.     Upon review of each ATF Form 4473 from Rural King's firearm transfers, it was noted that **OXNER** checked "Yes" in Block 21a, which states, "Are you the actual transferee/buyer of the firearm(s) listed on this form?"   In doing so, **OXNER** affirmed that he was the actual transferee/buyer of the firearm listed on line 1 - 3 on the forms.   Line 22 of the ATF Form 4473 was signed by **OXNER**, certifying that his answers were true, correct, and complete.

15.     Upon further review, I again noticed that **OXNER** again used the Woodbridge Address as his current address to purchase each of his firearms.

16.     During our visit, we met with the store manager, referred to herein as "N.L."  N.L. informed agents that she reviewed the video surveillance footage of **OXNER's** purchase of GUN A and remembered specific details from the transaction.   When asked if she remembered anything unusual about the purchase of GUN A, N.L. elaborated and provided additional information detailed below.

17.     N.L. stated that she was the Operations Manager at the time of the purchase of GUN A, but she was recently promoted to the store manager.   N.L. stated that a "Paper Check" was requested to complete **OXNER's** firearm purchase.   N.L. explained that a "Paper Check" is conducted for every firearm purchase.   The "Paper Check" is Rural King's final quality control confirmation for the completion of paperwork and payment for every firearm transaction.

18.     N.L. remembered **OXNER** behaving "skittish and nervous," but still talkative.   She remembered **OXNER** was by himself inside the store.   N.L. recalled inspecting **OXNER**'s Virginia identification card multiple times because something did not seem right about his card.   N.L. could not affirmatively state why she kept inspecting his card, but she did not see any reason to deny the firearm sale.   N.L. commented that she thought it was strange that a Woodbridge resident would travel all the way to Front Royal to purchase a common pistol, but she noted that Rural King had good prices.   Of note, the driving distance between Woodbridge and Front Royal

is approximately 65 miles.  Based on my knowledge, I know there are at least two FFLs near **OXNER**'s listed address in Woodbridge, Virginia.

19.     N.L. stated that **OXNER** purchased GUN A with T.O.'s bank card, but she did not recognize the discrepancy between the name on the ATF Form 4473 and the name on the bank card used to purchase the firearm until it was too late.  N.L. appeared embarrassed and apologetic for the mishap.

20.     N.L. provided agents with copies of the bank card transactions and stated that **OXNER's** bank card was declined numerous times before the transaction completed.  During our interview, N.L. said that should have been a red flag for store employees.  N.L. recalled that **OXNER's** bank card declined initially because he input the wrong pin.  **OXNER** attempted the bank card approximately two more times with the correct pin code, but the card still declined each time.  Then, **OXNER** left the store and returned approximately ten minutes later with a $20 in cash.  **OXNER** provided $20 in cash and the bank card to complete the transaction.  N.L. reiterated that she did not recognize that the name on the bank card to be another individual's until after **OXNER** exited the store.  When asked what name was on the bank card, N.L. replied, "If you say the name, I will agree or disagree."  I provided her with the full name of T.O. and N.L. replied, "Yes!"

///

///

///

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

21.     At approximately 7:45 pm, N.L. emailed your Affiant a more detailed version of the declined bank card transactions and receipts.  Below are images of the receipts documenting the bank card declinations.



22.     Below is an image taken from the security camera footage[3] showing **OXNER** (circulated in red) in the store during the purchase of the above referenced firearm:

---

[3]     A redaction was applied to the security image above for purposes of this Affidavit and it covers an employee/worker in the store.  The red circle has also been added.

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

11

23.     Based on my training and experience, and involvement in this investigation, I believe it is significant that a bank card issued to T.O. was used to purchase GUN A, which was later allegedly used by T.O. in a shooting four days later in Washington, D.C.  Based information provided in this Affidavit, I believe there is probable cause to conclude that **OXNER** purchased the firearm for T.O. with his relative's knowledge.  Therefore, I believe **OXNER** did not truthfully complete the ATF Form 4473.  Further, I believe **OXNER** may have driven to a more distantly located FFL to decrease the likelihood of connecting them to an illegal straw-purchaser transaction by conducting the purchase outside the area.  This is not an uncommon tactic used by criminals in an effort to evade law enforcement detection.

24.     Furthermore, each of **OXNER**'s identified firearms were all purchased with cash except for GUN A.  Based on my training and experience investigating firearms trafficking, it is common practice for straw purchasers and traffickers to use cash in order not to leave a financial paper trail connecting them to the actual recipient of the firearm.

E.      **Records of OXNER's Firearms Purchases from D&H Guns, including ATF Form 4473**

25.     On or about November 16, 2021, I contacted D&H Guns located at 43 Acorn Hill Ln, Woodstock, VA 22664 for information related to **OXNER**'s firearm purchase.  The store owner advised that on April 7, 2021, OXNER attempted to purchase a Glock 19, 9mm pistol, but was denied.  **OXNER** was denied the firearm sale because he purchased a Glock 43X on the same day from another FFL.  The law in Virginia allows residents to purchase only one pistol per month, unless they have a valid concealed carry permit.

26.     According to the FFL and ATF Form 4473, **OXNER** returned on June 8, 2021, and purchased a Glock 19, 9mm pistol bearing serial number BTDF608, (hereinafter, "GUN I").  Based on my knowledge and experience investigating straw purchasers and firearms traffickers, it is common for straw purchasers in Virginia to attempt to purchase multiple pistols from various FFLs

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

12

on the same day or within the same month. Some straw purchasers are not aware of the of the National Instant Criminal Background Check (NICS) database used to confirm their ability to purchase firearms. Therefore, they think they can circumvent the state law.

27.     In other instances, traffickers are aware and attempt to circumvent the checks and balances by travelling to distant FFLs to make the second or subsequent purchases. They think a firearm purchase "Denial" is initiated by the FFL, not a national or state database.

28.     On or about November 16, 2021, Detective Thomas Webb visited D&H Guns and retrieved ATF Form 4473 and supporting documents related to the April 7, 2021 denial and the June 8, 2021 purchase.

    **F.**   <u>**Interview of OXNER's Significant Other, "A.B." in Winchester, VA**</u>

29.     On or about November 15, 2021, Detective Webb and I traveled to OXNER's suspected true residence in Winchester to locate and interview **OXNER**.  I identified the address as a potential address for **OXNER** after a review of law enforcement databases.  One of the purposes of the interview was to confirm whether **OXNER**'s true residence was the claimed address on Woodbridge Address.  As stated earlier, **OXNER** used the Woodbridge address on all his ATF Form 4473 and supplemental documents to purchase firearms.  Agents were unsuccessful in locating **OXNER** at the Woodbridge address.

30.     While conducting surveillance in the parking lot of the Winchester residence, I identified a red Nissan, Altima belonging to an individual referred to herein as "A.B."  The vehicle was parked in front of the Winchester residence.

31.     I recognized the vehicle and license plate from a traffic stop report in January 2021 involving **OXNER** in Front Royal, Virginia.  Law enforcement databases confirmed the vehicle was registered to A.B. and driven by **OXNER**.

32.     Detective Webb and I knocked on the door of the Winchester residence and announced ourselves as the police.  A.B. answered the door.  We presented our credentials and

Mensah Aff. in Support Of A Criminal Compl.

asked if **OXNER** was home.  During our exchange, A.B. was uncooperative.  She told agents **OXNER** was at work, but initially claimed to not know where **OXNER** worked when asked.  When confronted with the fact that she has a child with **OXNER**, A.B. admitted she knew where he worked, she but refused to tell agents.  Agents asked for **OXNER**'s cell phone number.  A.B. refused to provide his number and said she forgot it. Agents reiterated the need to interview **OXNER**, but A.B. remained uncooperative.  She stated, "I sleep with him every night. He isn't a witness to anything."  A.B.'s statement about sleeping with **OXNER** every night is consistent with his residence at the address in Winchester with A.B.  Agents left the residence and conducted surveillance in the apartment parking lot.

G.  **Agents Contacted OXNER via his Cellular Phone and He Later Arrived in A.B.'s vehicle to Meet with Agents for an Interview**

33.  Shortly after leaving the residence, Detective Webb and I traveled to Winchester Police Department (WPD) where we were assisted by local law enforcement in locating **OXNER**.  That afternoon, **OXNER** contacted law enforcement after he realized they were looking for him and provided cell phone number.  **OXNER** provided law enforcement with his cell phone number.  I called **OXNER** and explained that agents needed to interview him regarding a law enforcement investigation.  **OXNER** agreed to meet agents at a gas station in Winchester, Virginia because it was close to his apartment.

34.  At approximately 6:30pm, **OXNER** arrived at the gas station in A.B.'s vehicle and met agents.  **OXNER** entered my front passenger seat and asked me to drive to a different location because he did not want to be seen with law enforcement.  Per his request, I drove around corner to an empty apartment building parking lot where the interview commenced.

35.  **OXNER** initially provided biographical information by stating his name and date of birth.  Agents discussed **OXNER**'s work history and **OXNER** informed agents that he currently worked at Ferguson.  When asked where he lived, **OXNER** stated that he lived at the Winchester residence for approximately a year.  **OXNER** said he moved to there on or about December 4,

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

2020.  When asked where he lived prior to moving to Winchester, **OXNER** stated that he lived in Oxon Hill with his grandmother.  **OXNER** said he lived at an address on Spokane Drive in Oxon Hill, Maryland, ever since his mother kicked him out of the house in 2016.  **OXNER** stated that his mother lived at the Woodbridge Address and insisted that she still resided at the address.

36.     After discussing his residential history, I presented **OXNER** with each ATF Form 4473 he completed for each gun.  **OXNER** admitted that he purchased each of the firearms and confirmed his signature on the forms.  When asked what he was doing with the firearms, **OXNER** stated, "they are mine."  I asked **OXNER** where the firearms were located, and he refused to discuss their whereabouts.  **OXNER** reiterated that he did not want to talk about any firearms and asked if he was being detained.  The interview concluded shortly thereafter and **OXNER** departed the area.

### H.     Interview of Current Residents at Woodbridge Address

37.     On November 15, 2021, Detective Webb and I traveled to the Woodbridge Address to confirm the actual residents of the house.  Agents were greeted by a Hispanic family who did not appear to have much fluency in English.  Eventually, the lease holder of the property arrived; he explained that his family has rented the property for the last three years.  I showed the man a picture of **OXNER**.  The man said he did not know **OXNER** and has never seen him.  Based on this exchange and **OXNER**'s admissions about the location of his current residence, I believe **OXNER** intentionally provided a false address when purchasing the firearms described above.  Based on my training and experience, I believe **OXNER** provided false information to conceal his connection to illegal firearms transactions where he served as the straw purchaser.

### I.     Execution of Search Warrant at OXNER's Residence in Winchester, Virginia

38.     On November 18, 2021, ATF executed a federal search warrant at **OXNER**'s residence, which he shared with A.B.  Upon entry, I called **OXNER**'s number to determine which cellphone was his and seized it.  In addition to his cellphone, I identified his Virginia identification

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

card, which was used to purchase each of the firearms in the Western District of Virginia.  Agents discovered the identification card was broken in half and had been taped and glued back together.  Based on my training and experience investigating firearms trafficking, it is common for straw purchasers to covet Virginia identification cards with a previous address because they can purchase firearms and not reveal their actual residence.  Doing so makes law enforcement investigations more challenging because traffickers believe it is harder to be tracked.  I know from common sense, training, and experience, that many citizens would simply replace or renew their identification card if damaged or destroyed.  Below is an image of the driver's license with redactions added for purposes of this Affidavit and the broken portion is highlighted with a red arrow:



39.     Furthermore, agents discovered a lease agreement application for residential lease that listed **OXNER** and A.B.'s current and prior addresses.  The Virginia Realtors document was completed and signed by **OXNER** and A.B. on November 8, 2021, i.e. ten days before the search warrant was executed.  **OXNER** and A.B. listed their current address as an apartment on Woodstock Lane in Winchester, Virginia and **OXNER**'s prior address as an address in Oxon Hill, Maryland.  This discovery corroborates **OXNER**'s admission that he lived in Oxon Hill, Maryland prior to living in Winchester.   Furthermore, this evidence is also consistent with **OXNER** providing a false statement on the ATF Form 4473 about his actual residence in connection with the purchase of GUN A.

40.     The search of **OXNER**'s residence failed to yield any firearms, documents related to firearms, ammunition, shooting paraphernalia, magazines nor firearm boxes. The absence of these items is also consistent with an individual who is trafficking or straw purchasing firearms for other individuals, as opposed to purchasing them as the true owner.

## V.     CONCLUSION

41.     Based upon the foregoing, I submit there is probable cause to conclude **OXNER** committed a violation of 18 U.S.C. § 924(a)(1)(A) (False Statement During Purchase of a Firearm) on or about on January 21, 2021 in the Western District of Virginia.

///

///

///

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

/s/ Bernard Mensah
BERNARD MENSAH
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives


Received by reliable electronic means and sworn
and attested to by telephone on
this 6th day of June 2022.


JOEL C. HOPPE
United States Magistrate Judge

MENSAH AFF. IN SUPPORT OF A CRIMINAL COMPL.